J-A06038-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: I.Q., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1078 WDA 2025 |

Appeal from the Order Entered July 29, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000087-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: I.Q., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1079 WDA 2025 |

Appeal from the Order Entered July 21, 2025
In the Court of Common Pleas of Allegheny County Juvenile Division at
No(s): CP-02-DP-0000046-2023

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: April 24, 2026**

I.Q. ("Father") appeals from the orders entered by the Allegheny County Court of Common Pleas ("trial court") terminating his parental rights to M.L. ("Child"), born November 2015, and changing Child's permanency goal from reunification to adoption.  Because we conclude that the trial court did not abuse its discretion in terminating Father's parental rights pursuant to 23

Pa.C.S. § 2511(a)(2) and (b), we affirm the order terminating his parental rights and dismiss Father's appeal of the goal change as moot. Father further contends that his counsel provided ineffective assistance, but because he has not established that his claim has merit or that he was prejudiced by counsel's conduct, we deny Father's application for remand.

Child was adjudicated dependent under the Juvenile Act after being removed from Father's care in January 2023 via an emergency custody order. On September 19, 2024, CYF filed separate petitions seeking termination of Father's parental rights and a change of Child's permanency goal from reunification to adoption. Of relevance to our disposition, CYF sought termination under section 2511(a)(2) and (b) of the Adoption Act, which provide:

> **(a) General rule.** --The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> **(b) Other considerations.** --The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), (b).

Over the course of three evidentiary hearings,[1, 2] CYF presented the testimony of its casework supervisors Keri Vanderpool ("Vanderpool") and Michele Haney ("Haney"); Dr. Beth Bliss, a psychologist appointed by the court to assess the family; Sara Bauer ("Bauer"), a treatment coordinator with foster care agency Pressley Ridge; Jennifer McPaul ("McPaul"), a Pressley Ridge youth and family support specialist who supervised the visits between Father and Child; and K.U., a foster parent who cared for Child for several months. Father testified on his own behalf and presented the testimony of his partner, M.M. Both parties admitted numerous exhibits. The following is a summary of the factual and procedural history of the case, taken from the voluminous record.

---

[1] The trial court appointed counsel to represent Child's legal interests in accordance with 42 Pa.C.S. § 2313(a).

[2] Pursuant to 42 Pa.C.S. § 6351(i), the same judge who presided over Child's ongoing Juvenile Act proceedings also presided over the Adoption Act proceedings.

Father and Child's mother ("Mother") married shortly after Child's birth. CYF Exhibit A (Stipulations ¶ 3). Father has been Child's caretaker since Mother's death in 2016.[3] *Id.*

After Mother died, Father obtained assistance from CYF regarding Child's maternal half-siblings. Order of Adjudication and Disposition, 5/18/2023, ¶ 19; N.T., 4/8/2025, at 27.[4] In previous proceedings, the trial court awarded Father custody of two siblings, O.T. and C.B. CYF Exhibit A (Stipulations ¶¶ 18-19); N.T., 4/8/2025, at 98. Subsequently, O.T. exhibited sexual behaviors towards C.B., which resulted in Father seeking alternative care for O.T. and the trial court's dependency adjudication of O.T. CYF Exhibit A (Stipulations ¶ 19).

After losing their housing in 2022, Father, Child, and C.B. moved into a temporary shelter before moving into an apartment. *Id.*, ¶ 21. At Father's request, CYF helped Father obtain transportation assistance from the school districts Child and C.B. previously attended. *Id.*, ¶ 22.

---

[3] Prior to Child's dependency, legal paternity had not been established, but the parties agree, and the trial court has found, that Father is Child's parent. CYF Exhibit A (Stipulations ¶ 3); CYF Exhibit 1 (Order of Adjudication and Disposition, 5/18/2023, ¶ 16).

[4] CYF introduced certified copies of the trial court's orders in Child's dependency matter as CYF Exhibit 1. Because Father also appealed from the order changing Child's permanency goal, the certified record in that matter also contains the orders. For ease of review, we cite directly to the individual dependency order.

In January 2023, Father began a commercial truck driving job with overnight shifts twice a week. *Id.*, ¶ 25. On other days, he left for work around 4:00 a.m. and did not return until 5:00 or 6:00 p.m. *Id.* While he was at work, Father left seven-year-old Child and ten-year-old C.B. home alone. *Id.* Once or twice a month, Father also left the children alone at night for three to four hours while he cared for dogs he kept at a separate location. *Id.*, ¶ 24.

CYF received an initial report citing concerns about Child's supervision in mid-January of 2023. N.T., 4/8/2025, at 30. Although Child had received an out-of-school suspension for bringing two kitchen knives to school, she returned to school the day of the suspension with the knives still in her possession. *Id.* CYF attempted to investigate this referral, but Father refused to cooperate. *Id.* at 30, 89.

On January 26, 2023, C.B. disclosed that she and Child had been home alone for multiple days; when Father could not be reached, police took protective custody of the children at their respective schools. Order of Adjudication and Disposition, 5/18/2023, ¶ 1; *see also* Shelter Care Order, 2/9/2023, at 2; N.T., 4/8/2025, at 31. CYF obtained a verbal emergency custody authorization from the trial court and placed Child and C.B. into foster care. Emergency Protective Custody Order, 1/27/2023, at 1.

The court ordered both children to remain in foster care following a shelter hearing. Shelter Care Order, 2/9/2023, at 1. The court found that

Father had been uncooperative and unwilling to speak with the caseworker; the children disclosed that Father restricted what they could say outside the home and physically disciplined them if they disobeyed; and at the time, Child wished to remain in placement. *Id.* 1-2. The court ordered Father to provide CYF with the children's "clothing and personal items." *Id.* at 3. It restricted his contact with Child to supervised visits twice a week at CYF or the foster care agency's offices and to supervised telephone contact. *Id.*

After hearing testimony from CYF caseworkers, police officers, school representatives, Father, Child, and C.B. over the course of two hearings, the trial court adjudicated Child and C.B. dependent, finding that the children lacked proper parental care and control based upon Father leaving them alone without appropriate supervision on multiple occasions. Order of Adjudication and Disposition, 5/18/2023, at ¶¶ 9, 23-32; *see also* N.T., 4/8/2025, at 32-33; N.T., 5/3/2023, at 178. The court noted that Father firmly believed his supervision and communication arrangements were appropriate because neighbors were nearby, he left sufficient food, and he equipped the apartment with video cameras, a cell phone, and an "echo dot" device with voice automated communication capabilities. Order of Adjudication and Disposition, 5/18/2023, ¶ 26. In contrast to Father's assurances about his supervision plan, however, the court found from the children's testimony that Father did not always answer when the children contacted him, C.B. did not know Father's phone number, and C.B. could not identify any neighbors by name.

*Id.*, ¶¶ 30-31. From the children's descriptions of the household routines, the court ascertained that C.B. bore responsibility for ensuring that Child was awakened, showered, and dressed for school each morning; for performing after-school routines; and preparing dinner each evening. *Id.*, ¶¶ 28-31. Furthermore, because C.B.'s school van left first, Child waited alone for her school van and was responsible for locking the home before she left. *Id.*, ¶ 29.

Because Father persisted in his steadfast belief that leaving the children alone was appropriate because no specific law prohibited him from doing so, the court decided that Children's placement outside Father's home was clearly necessary. *Id.*, ¶ 32. Specifically, the court determined that the conditions leading to placement included Father's need "to ensure adequate and age-appropriate parental supervision; to establish appropriate childcare arrangements for periods when he is absent from the home; to maintain his relationship with the [c]hildren through visitation; and to maintain appropriate involvement in educational and medical decision-making for the [c]hildren." *Id.*, ¶ 42.

The court further directed CYF to investigate C.B. and Child's references to Father's "whoopings," which suggested that he may use "possibly inappropriate" physical discipline; based upon the evidence it had received to date, however, it declined to make a finding regarding the appropriateness of the physical discipline. *Id.*, ¶ 40.

Finally, the court found that Father refused to respond to any communication from CYF, declined the opportunity to have supervised visits with Child and C.B., and refused to provide the children with personal items from home in foster care.[5]  *Id.*, ¶ 39; *see also* N.T., 4/8/2025, at 34-35, 91 (Vanderpool's testimony that Father told CYF's caseworker to stop calling about his kids, texted with messages instructing CYF not to contact him on his private number, refused to send items from home because he purchased them and therefore they were his, and failed to respond to a text specifically informing him that Child wished to visit with him).  The court ordered Child to remain in foster care and maintained the supervision requirement for Father's visits.  *Id.* at 6.

For over a year after Child's removal from his care, Father refused to visit with Child, participate in case planning, engage with CYF, or attend court hearings, hindering CYF's ability to set goals to allow for reunification.  N.T., 4/8/2025, at 42, 111.  During this period, the trial court twice made findings of no compliance and no progress towards alleviating the conditions that

---

[5]  An example of Father's non-cooperative behavior occurred during the adjudicatory hearing itself.  After the trial court announced that it was adjudicating Child dependent, Father left the courtroom before it addressed disposition.  N.T., 5/3/2023, at 180.  Expressing disappointment, the trial court noted that it would have liked to discuss options for returning Child to Father "with appropriate childcare arrangements" if Father had been willing to cooperate with the court and CYF.  *Id.*

brought Child into care. Permanency Review Order, 8/25/2023, at 2; Permanency Review Order, 1/13/2024, at 2.

Father's refusal to comply with the court-imposed conditions left Child without a parent to address her emotional, medical, educational, and therapeutic care, resulting in the court's appointment of Child's foster parents as educational and medical decision-makers. **See** N.T., 4/8/2025, at 42, 51, 134; Appointment Orders, 2/23/2023, 5/23/2023, 1/9/2024, at 1. In Father's absence, Child struggled in foster care. According to her first two foster families, Child experienced behavioral challenges including tantrums, hitting, and kicking, and both families ultimately requested that CYF change her placement. **Id.**, ¶ 37. Child underwent therapy and at times required emergency intervention services. **Id.**, ¶ 38; Permanency Review Order - Amended, 9/15/2023, at 2; **see also** N.T., 4/8/2025, at 48-50. In December 2023, CYF placed Child in the preadoptive foster home of S.H. and R.H. N.T., 4/8/2025, at 50-52.

It was not until several months after CYF placed Child with S.H. and R.H. that Father finally appeared at a hearing, opposing CYF's motion requesting a finding of aggravated circumstances. Continuance Order, 4/8/24, at 1. Following a continuance for appointment of counsel,[6] the trial court found that

---

[6] Father chose to represent himself at the shelter care and adjudicatory hearings. The trial court appointed the Juvenile Court Project to represent Father upon his request, but he discontinued representation mid-hearing in
*(Footnote Continued Next Page)*

aggravated circumstances existed based upon Father's failure to maintain substantial and continuing contact with Child for a period of six months. Aggravated Circumstances Order, 5/8/2024, at 1. The court found that since Child was placed in foster care, Father did not visit her or maintain contact through other means, such as telephone or letters. *Id.* He also did not participate in school events and meetings or any appointments. *Id.* Father even rejected the overtures of Child's foster parent K.U., who reached out to him in the hopes of facilitating contact between Father and Child. *Id.* Father's lack of involvement and refusal to visit her negatively impacted Child, especially causing her distress in the first half of 2023. *Id.* The court noted Father's proclaimed desire to reunify with Child and his assertion that CYF has not attempted to involve him over the past year, finding Father's version of events "inaccurate." *Id.* Nonetheless, it directed CYF, who by then had a new caseworker and supervisor assigned to the case, to continue to make reasonable efforts towards reunification and to attempt to re-engage Father in case planning, supervised visitation, and Child's treatment. *Id.* at 1-2.

---

August 2024, necessitating a continuance and appointment of a second attorney. Continuance Order, 8/21/24, at 1. In February 2025, Father requested new counsel, citing dissatisfaction with his second court-appointed counsel. The trial court appointed Attorney Marjorie Crist to represent Father. Continuance Order, 2/20/2025, at 1. Attorney Crist ceased her private practice shortly after she filed this appeal, and the trial court appointed Attorney Aaron Sontz to represent Father on appeal.

At a review hearing held several days after the aggravated circumstances hearing, the juvenile court found that Father was not compliant with the permanency plan despite CYF's reasonable efforts. Permanency Review Order, 6/4/2024, at 1. Noting Father's lack of contact with Child since January 2023, the trial court found that Father refused to visit Child under the court-ordered conditions. *Id.* at 2. Father once again requested Child's return, but the trial court found continued concerns regarding his parenting and lack of contact. *Id.* Additionally, Father had resumed caring for O.T., which presented challenges with ensuring Child's safety. *See id.* at 3.

Father continued his claim that CYF did not notify him of all court proceedings and asserted that the dependency proceedings infringed upon his constitutional right to raise his children as he sees fit. *Id.* During his testimony, Father refused repeated requests from his counsel and the hearing officer to cease talking. *Id.* He became belligerent, resulting in the Sheriff's deputies detaining him and removing him from the courtroom by force. *Id.*[7]

Following this hearing, Father finally agreed to begin visiting Child, which the trial court permitted under supervision once CYF obtained recommendations from Child's therapist "regarding visit circumstances, setting, and support for [Child]." Clarification Order, 6/10/2024, at 1. It also required CYF to advise Father of Child's medical and educational appointments

---

[7] Father was arrested and criminally charged, but the charges were later withdrawn. CYF Exhibit 3.

and outcomes, but it did not permit Father to attend at that time. *Id.* It ordered Father to cooperate with CYF as it conducts a full assessment of Father and ordered CYF to schedule psychological evaluations. Permanency Review Order, 6/4/2024, at 3.

Father first responded to CYF's renewed attempts at outreach by email on May 22, 2024—nearly a year and a half after Child's removal from his care—and told CYF for the first time that he had moved to Johnstown, Pennsylvania. N.T., 4/8/2025, at 136, 152. Although Father agreed to engage with CYF and his communication with the agency was appropriate, it was more limited than CYF would prefer and primarily through email (at his request). *Id.* at 116-17, 150.

Given Father's long absence from Child's life, and the increase in Child's emotional outbursts when she learned she might visit with Father, CYF recommended family therapy. CYF first wanted Father to visit Child consistently and to undergo an interactional evaluation with Child with Dr. Bliss to target the therapy. *Id.* at 121, 124. As described in more detail herein, Father ultimately did not visit consistently, did not initially respond when asked if he would be willing to participate in family therapy, and refused to participate in evaluations with Dr. Bliss.[8] *Id.* at 119-22.

_____

[8] Dr. Bliss, the psychologist appointed by the trial court to conduct evaluations of the family, testified that in order to conduct an evaluation of a parent, the parent needs to consent to the evaluation's limited confidentiality, inasmuch
*(Footnote Continued Next Page)*

Father and Child first visited on August 30, 2024, in part because Child's therapist was slow to respond to CYF's attempts at outreach[9] and in part because Father's abrupt out-of-county move, lack of transportation, and refusal to use ride-sharing services and public transportation created logistical hurdles. *Id.* at 127, 137-40, 152. Although maintaining that Child should endure the travel instead of him, Father eventually accepted gas cards to use when borrowing his girlfriend's car. *Id.* at 137-40.

Father's visits remained under court-ordered supervision at the offices of the foster care agency and later CYF. According to McPaul, she had no safety concerns and Child seemed happy to see Father and appeared to enjoy the visits. N.T., 5/29/2025, at 33, 53. Child and Father had numerous positive interactions at the visits, during which they talked about Child's life, Father brought her a guitar to play and a picture of him and Child, and they discussed other family members. *See generally* CYF Exhibit 5.

---

as Dr. Bliss could include anything that the parent discussed during the evaluation in a report that would be released to CYF and the trial court. N.T., 5/29/2025, at 19. Although Father signed other consents and claimed that he would sit for the evaluation, he refused to agree to the limited confidentiality condition. *Id.* at 19; *see also id.* at 162 (Father's testimony that he would participate in the evaluation only if he could delay his consent to release any information until after Dr. Bliss performs the evaluation).

[9] It is unclear what the therapist's recommendations were, if any, other than generally noting that family therapy would work best after first re-establishing the relationship for a time. N.T., 4/8/2025, at 129.

However, the visits were not all positive. Father ultimately attended only eighteen or nineteen visits—approximately half the visits offered. *See generally id.*; N.T., 5/29/2025, at 119, 121-22. Father cancelled three visits because of a car accident and a medical issue. *Id.* at 121. Two visits did not occur because Father refused to visit without O.T., even after CYF and the foster care agency told him that bringing O.T. violated their policies. *Id.*[10] Additionally, Father cancelled or failed to appear at thirteen visits. *Id.* at 121, 147. Once, he claimed he lacked the financial resources to visit, despite CYF's recent provision of a gas card that would have covered twelve visits. *Id.* at 154.

Although Child normally has a chatty demeanor, when Father was a no-show for visits, Child put her head down and was quiet on the ride home. N.T., 5/29/2025, at 36, 39. She twice refused to visit—once expressing that she was tired of being disappointed and frustrated, and stating that he deserved to feel upset like she feels when he does not attend. N.T., 4/8/2025, at 149; CYF Exhibit 5 (11/15/2024 note).

Of the visits that did occur, Father typically left up to a half hour before the two-hour visit was scheduled to end, sometimes even leaving abruptly without notice. *See generally* CYF Exhibit 5; N.T., 5/29/2025, at 30-31, 34.

---

[10] The trial court ultimately allowed Father to bring O.T. to one visit, barring any objections by Child, but otherwise ordered Father to visit Child without O.T. so as not to detract from reestablishing their relationship. Continuance Order, 10/23/2024, at 1-2.

He stayed for the entire allotted visit only twice. N.T., 5/29/2025, at 34. On September 20, 2024, he left without warning ten minutes into the visit after questioning why McPaul's coworker was shadowing her for training and demanding to see her personal identification instead of her work badge. ***Id.*** at 34-35, 47. After telling Child he was having a bad day and he was not aware they were having guests, he went into the kitchen and then walked out without saying anything further to Child. ***Id.*** at 57; CYF Exhibit 5 (9/20/2024 visit note). Child put her head down and was quiet on the way home. N.T., 5/29/2025, at 56, 34.

Father also objected to supervision and security measures at the visits. For example, at the December 13, 2024 visit, in front of Child, Father told the security guard that this was his last time "doing this" because he was no longer giving his consent to have the guard scan his body with a wand prior to visits. N.T., 5/29/2024, at 37. As he was being searched, Father told Child that she deserved better than this and this was the last time they would visit unless the situation gets fixed. ***See id.*** McPaul observed that Child "appeared anxious and nervous during this time with her eyes darting around, bouncing her foot and leg as well as biting her fingernails." CYF Exhibit 5 (12/13/2024 visit note). During the next visit, McPaul and Child sat in the vehicle while McPaul attempted to ascertain whether Father was going to participate in the security screening. CYF Exhibit 5 (12/20/2024 visit note). Instead of entering the building, Father stood in the parking lot filming McPaul and Child. ***Id.*** He

- 15 -

eventually approached the vehicle, telling McPaul through the window that she "can take [his] daughter back to the place she lives because the visit won't be happening" and he was "not going to consent." *Id.* Child expressed feelings of anger and sadness towards Father on the way back to her foster home. N.T., 5/29/2025, at 38.

Thereafter, the trial court entered an order requiring Father to confirm twenty-four hours in advance that he would attend the visit and consent to the security search, and if he did not, CYF need not transport Child; Father then began to comply with security though stating his belief that the search violated his constitutional rights. N.T., 5/29/2025, at 47-48. At these visits, Father sometimes delayed going to the visitation room for no apparent reason, while Child looked out the window and bit her nails, seemingly anxious. CYF Exhibit 5 (3/28/2025 and 4/18/2025 visit notes). Father also ignored Child in the lobby several times; on April 4, 2025, for example, they stood in the lobby for seven minutes before Father even acknowledged Child's presence. *Id.* (4/4/2025 visit note); N.T., 5/29/2025, at 41, 58.

Despite Child's age, Father often addressed concerns about her care directly to her—the clothes she wore, her failure to follow her family's religious practices, and making her feel badly about following the rules of her foster home and participating in their family activities. *See* CYF Exhibit 5 (9/13/2024, 12/13/2024, 2/28/2025, 3/14/2025, 5/9/2025, 5/16/2025 visit notes); N.T., 5/29/2025, at 37, 56. Additionally, Child at times appeared

uncomfortable during conversations with Father. For example, during the February 21, 2025 visit, when Father was asking Child about how she felt about adoption, he told her that she was "unlawfully taken and abducted by CYF," that the "devil is a fucking lie," and that "[t]hese people lied," "stole" her from him, and were "trying to end [his] rights to [his] own child." CYF Exhibit 5 (2/21/2025 visit note). Father further asked Child more than once about how she felt when she heard about his accident and if she visualized it. *Id.* He subsequently abruptly ended the visit with thirty minutes left in their time together, telling Child he had a change of plans and would see her later. *Id.*

Before their last visit, Child told McPaul that Father makes her "sad and angry" and that she knows he lies to her about being kidnapped. *Id.* (5/16/2025 visit note). Child feared that Father would be angry because she recently had been suspended from school. *Id.* Child told McPaul that sometimes Father was scary when he was mad or when he used to hit her. *Id.* She talked about being angry and sad about "court stuff," and told McPaul that she was "80% sure that she wanted to live with" Father. *Id.*[11]

Child had adjusted well to her current foster home placement. After an initial adjustment period of acting out her emotions by destroying her room or crying uncontrollably when she entered her current foster home, Bauer has

---

[11] Ultimately, Father's discussion with her during the visit regarding her suspension was appropriate. N.T., 5/29/2025, at 52.

observed Child hugging her foster parents, smiling, laughing, and being playful in the foster home. N.T., 4/8/2025, at 52. She attends individual therapy; she participated in more intense family-based therapy services to help her process her emotions and reduce outbursts, but the services successfully closed in January 2025. *Id.* at 167-68. Bauer believes Child and her foster parents share a "caring, loving, comfortable, just a typical normal bond" and described their relationship as "very open, honest, [and] caring." *Id.* at 168-76. Child was closed off at the beginning and her foster parents took time to create the bond with her. *Id.* at 177. Now, Child enjoys physical affection from her foster parents, looks to them for comfort, answers to questions, and homework assistance, and likes to show them gymnastic moves and play games with them. *Id.* She gives pushback but listens to her foster parents the majority of the time. *Id.* Child enjoys serving as a bigger sister figure towards her younger foster brother, by bossing him around, playing with him, and looking after him. *Id.* at 169.

Haney noted that Child's responses regarding her preferences regarding termination of Father's rights have varied in different conversations. *Id.* at 131. Haney believes that Child and Father have a bond, but she is unsure of the strength and nature and wished the agency could have received answers from an interactional evaluation. *Id.* at 132. She has observed that Child responds to certain questions with whatever Father wants or what she thinks

will make Father happy, and appears more withdrawn, avoids eye contact, and appears uncomfortable around him. *Id.*

Dr. Bliss conducted an individual evaluation of Child, wherein she observed that Child said if she could live with anyone, she would choose Father or his prior girlfriend because she misses them and her siblings. N.T., 5/29/2025, at 22. Dr. Bliss opined that Child and her foster parents share a "strong bond and attachment," the foster parents are meeting all of her needs, and if the court decides that termination is warranted, the foster parents are an appropriate adoptive resource. CYF Exhibit 6 (5/20/2025 Evaluation at 6). Child feels safe with her foster parents, is mostly happy, has minor disturbances that foster parents are helping her with—including obtaining a 504 plan through the school—participates in extracurricular activities, and does fairly well in school academically and behaviorally. *Id.*

Following its receipt of the foregoing evidence, the trial court granted the petition to terminate Father's rights pursuant to section 2511(a)(2), (a)(8), and (b) of the Adoption Act. Describing subsection (a)(2) as the "best fit" for the situation, the court determined that CYF proved that Father repeatedly and continuously refused to meet Child's needs in a persistent pattern that could not be remedied. N.T., 7/21/2025, at 7-8. It found that Child shared a bond with Father and will experience pain when it is severed, but that severing it best served her needs and welfare because the bond is unhealthy and hinders her. *Id.* at 21-27. She shares a healthy and positive

bond with her foster parents, who consistently meet her needs, even when she struggles, and provide her with security and stability. *See id.*

In light of the termination of Father's rights, the court concluded that it was in Child's best interests to change her permanency goal to adoption. *Id.* at 28. It concluded that visitation with Father should cease based upon its finding that Child's bond with Father is unhealthy for her, but stated its intent to consider and defer to CYF and Child's dependency guardian ad litem if they present a proposal for additional communication or visitation that they believe serves Child's interests. *Id.*

Father filed a timely notice of appeal.[12] Father presents four issues:

(1) Did the [trial] court abuse its discretion when it granted the petition to terminate parental rights and change the permanency goal to adoption where [CYF] failed to present clear and convincing evidence to prove the requirements for termination under 23 Pa. C.S. § 2511(a)(2), and (a)(8).

(2) Did the [trial] court abuse its discretion when it granted the petition to terminate parental rights and change the permanency goal to adoption where [CYF] failed to present clear and convincing evidence to prove the requirements for termination under 23 Pa. C.S. § 2511 (a)(8), and (b). Additionally, was trial counsel ineffective for failing to hire a psychologist to conduct an individual evaluation of [Father] and an interactional evaluation of [Father] and [Child] to determine if termination of parental rights served her best interest and welfare.

(3) Did trial counsel provide ineffective assistance by failing to hire a private psychologist to conduct individual and interactional evaluations of [Father] and [Child] and for failing to raise this issue in the concise statement.

_____

[12] Father and the trial court complied with Pa.R.A.P. 1925.

(4) Did the [trial] court abuse its discretion when it changed the goal from reunification to adoption where [CYF] failed to prove by clear and convincing evidence that the goal change was in the child's best interest.

Father's Brief at 7.

### Legal Framework

We adhere to the following standard in reviewing a trial court's grant of an agency's petition to involuntarily terminate a parent's rights:

> In cases concerning the involuntary termination of parental rights appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [juvenile] court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law.  That is, if the factual findings are supported, we must determine whether the [trial] court made an error of law or abused its discretion.  An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.

*In re Adoption of G.W.*, 342 A.3d 68, 83-84 (Pa. Super. 2025) (en banc) (quoting *In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021)).

In our review, we are cognizant that terminating a parent's rights to a child "is among the most powerful legal remedies that the judicial system possesses."  *Id.* at 84 (quoting *Interest of S.K.L.R.*, 256 A.3d 1108, 1129 (Pa. 2021)).  We also bear in mind that "in termination cases involving close calls," our Supreme Court has emphasized that "deference to the trial court's determination is particularly crucial."  *In re Adoption of L.A.K.*, 265 A.3d

580, 597 (Pa. 2021). Our standard of review prohibits this Court from "search[ing] the record for contrary conclusions or substitut[ing our] judgment for that of the trial court." *S.K.L.R.*, 256 A.3d at 1124. "Because [trial] courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing [trial] courts' decisions in this arena, appellate courts defer to [trial] courts' first-hand observations as they relate to factual determinations." *Id.*

The Adoption Act requires a bifurcated process when considering a petition to terminate an individual's parental rights. *G.W.*, 342 A.3d at 82-83. "Courts must begin by first considering whether a parent's conduct warrants termination under section 2511(a) prior to shifting its focus to whether termination best serves the child's needs and welfare." *Id.* at 83. The petitioner only needs to prove one of the eleven distinct grounds under subsection (a) to shift the focus to section 2511(b), which then requires the court to determine whether termination serves the child's developmental, physical, and emotional needs and welfare. *In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (en banc). The party seeking termination must prove the elements of section 2511 by clear and convincing evidence, which is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted). This Court may affirm the trial court's

decision to terminate parental rights pursuant to any one subsection of section 2511(a), as well as subsection (b). *In re J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013). We therefore examine whether the trial court's decision to terminate Father's parental rights to Child under subsection (a)(2) was an abuse of discretion.

## Section 2511(a)(2)

To satisfy its burden of proof under section 2511(a)(2), CYF needed to establish by clear and convincing evidence that (1) Father's actions or inactions constitute a "repeated and continued incapacity, abuse, neglect or refusal"; (2) such refusal has caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being; and (3) Father cannot or will not remedy the conditions and causes of the refusal. *See* 23 Pa.C.S. § 2511(a)(2); *Matter of Adoption of M.A.B.*, 166 A.3d 434, 444 (Pa. Super. 2017). Section 2511(a)(2) is not limited to a parent's affirmative misconduct; it includes "acts of refusal" and "incapacity to perform parental duties." *M.A.B.*, 166 A.3d at 444. In upholding the constitutionality of section 2511(a)(2)'s identically worded predecessor, the Supreme Court explained that the language of subsection (a)(2) is "broad," "speaks in general terms," and "does not prohibit or regulate any particular conduct"; the statute "is concerned only with the welfare of children whose essential needs have not been met, and whose parent cannot or will not meet those needs in the future." *In re William L.*, 383 A.2d 1228, 1232 (Pa.

1978). Section 2511(a)(2) emphasizes the child's present and future needs for essential parental care, control, or subsistence. *See In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010). To that end, "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019).

Trial Court's Reasoning

The trial court determined that CYF proved that Father repeatedly and continuously refused to meet Child's needs in a persistent pattern that could not be remedied. First, the court highlighted Father's initial choice to leave Child and her sister alone and unsupervised. N.T., 7/21/2025, at 7-8. The court found that Father believed then and continues to believe now that his choice was appropriate, failing entirely to account for Child's developmental, emotional, or physical needs. *Id.* While Father may have ensured that there was food in the house, he did not consider the impact of placing the responsibility upon Child at age seven to get herself ready and out the door for school. *Id.* at 9.

Second, the court found significant his refusal and failure to visit Child for over a year, which transferred the burden of his anger, shock, or sense of unfairness about the dependency system onto his seven-year-old child. *Id.* Compounding this was his complete failure to communicate with Child during that same period, which ignored Child's emotional need for her parent. *Id.* at 10. Father went so far as to reject the attempts at outreach by Child's foster

- 24 -

parent, refusing to speak to Child on Father's Day and failing to respond to K.U.'s texts even when she made it clear she was communicating at Child's request. *Id.* at 16. The court noted one particularly egregious communication from Father: following K.U.'s response to one of Father's few texts expressing gratitude for him sending a photo of Child as a newborn, stating it meant a lot to Child, Father replied that he sent the photo so that K.U. could see Child before she was kidnapped, not for K.U. to show Child. *Id.*

During this timeframe, Father would not even respond to requests concerning Child's health, education, and therapeutic needs, necessitating appointment of Child's foster parents as decisionmakers. *Id.* at 17. Shockingly, Father expressly refused to provide CYF with Child's belongings, depriving Child of the comfort of her own things when staying in a strange place. *Id.* at 18.

Third, the court determined that Father refused to communicate with CYF. *Id.* at 10. Because CYF had legal custody of his child, his failure to communicate with the agency meant that Father was refusing to work towards reunification with Child. *Id.* at 11. Compounding this failure was Father's refusal to come to court, which was his opportunity to make his voice heard. *Id.*

Once Father re-engaged with CYF and the court, the trial court found that he created artificial obstacles that interfered with him visiting Child. *Id.* at 11-12. He moved further away from her, declined to use Uber or a bus,

and wanted Child to endure the burden of the lengthy car ride instead of him. *Id.* at 11-13. The court acknowledged that he was not the sole cause of the delay in setting up visits, but noted that even when visits began, his self-created obstacles continued. *Id.* at 14. He refused to visit without Child's older sibling, objected to search procedures, and refused to visit in the presence of visit supervisor's colleague. *Id.*

The trial court also faulted Father for failing to take advantage of the opportunity to participate in the evaluations with Dr. Bliss. The court noted it repeatedly assured Father that Dr. Bliss is independent of the court and CYF and has recommended against terminating other parents' rights. *Id.* at 19. The court rejected Father's testimony that he had been willing to undergo the evaluation, just not to sign the release, as "semantics." *Id.*

Examining the entirety of the evidence of record, the trial court found a longstanding and persistent pattern of Father's refusals regarding issues small and large, which indicated to the court that "this cannot be remedied." *Id.* at 20. The trial court found that Father was unwilling or unable to place Child's needs before his own and to accept rules, processes, and expectations of systems with which he did not agree to meet his daughter's needs. *See id.* at 25.

### Father's Arguments

Father contends that the record does not support termination under subsection (a)(2). *See* Father's Brief at 21-42. He spends an inordinate

amount of his argument railing against the original dependency adjudication, asserting that Child's removal was unnecessary in the first place. *See id.* at 27-29, 31, 33-34, 41. In his view, there was no evidence he failed to meet Child's basic needs, and the court instead should have returned Child to his care and ordered CYF to provide childcare assistance. *Id.* at 39, 42. Although he claims, without citation to authority, that the circumstances that brought Child into care are irrelevant in an analysis under (a)(2), he notes that he has resolved them, as he lost the trucking job, the dogs he cared for have died, and he resides with his fiancée who works from home and can help supervise Child. *Id.* at 30-33.

Father dismisses his noncompliance with CYF and the dependency court orders as irrelevant, claiming his compliance was unrelated to the reason for Child's removal from his care and that the goals created were "arbitrary." *Id.* at 36-37. He further categorizes the supervision requirement for his visits and communications with Child as unnecessary, infringing upon his right to communicate with her privately. *Id.* at 37-38; *see id.* at 38 (Father stating he was always willing to visit, but "did not consent" to supervision). According to Father, his parenting was not the problem, it was the dependency system's interference with his parenting that was to blame. *Id.* at 36-42.[13]

---

[13] Child likewise seeks reversal of the trial court's decision. *See* Child's Brief at 13-19. CYF, on the other hand, contends the trial court's decision is fully supported by the record. *See* CYF's Brief at 33-46.

Analysis

Upon review of the statute and applicable caselaw, the parties' arguments, and the certified record, we conclude that the trial court's detailed analysis relies upon facts established in the certified record, correctly applies the law, and reflects reasoned judgment. Many of Father's arguments are premised upon his efforts to convince this Court that termination was not warranted because dependency was never warranted. He seeks to unwind the clock and attribute any faults to the dependency system instead of his own actions or inactions. Even if we were to agree with Father, this is not the basis upon which we may review and reverse a decision to terminate parental rights. The time to make these arguments was at the dependency hearing, from which Father left before it ended, or on appeal from the adjudication.

The sole focus of the termination decision is whether the petitioner met its burden under section 2511; it is not an opportunity to relitigate the dependency matter. *See In re J.A.S.*, 820 A.2d 774, 781 (Pa. Super. 2003). As this is an agency-initiated termination case pertaining to a dependent child, we begin from the standpoint that the parent "already demonstrated an inability to provide proper basic care." *In re Adoption of C.M.*, 255 A.3d 343, 369-70 (Pa. 2021). While Father may believe that he was a fit parent who always met Child's basic needs, the trial court has already decided otherwise by adjudicating Child dependent in January 2023. *See* Order of Adjudication and Disposition, 5/18/2023, at 1 (finding Child dependent by

- 28 -

clear and convincing evidence); *id.*, ¶ 42 (finding placement required because of Father's failure to provide "adequate and age-appropriate parental supervision" and "appropriate childcare"). Because the dependency court has already made factual findings, the trial court hearing the termination matter "cannot substitute its judgment for that of the dependency court on the same factual issue." *M.A.B.*, 166 A.3d at 446. Neither can we. *See id.*

The trial court found that CYF established all statutory elements required by subsection (a)(2), painstakingly detailing the multiple examples of Father's conduct that formed the basis for its conclusion that he repeatedly and continually refused to take actions that caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being and that Father cannot or will not remedy the conditions and causes of his refusals. As indicated by our lengthy discussion of the record above, the evidence in the certified record supports the trial court's factual findings. Because we defer to the trial court's on-the-ground insight of the family, this means that we must affirm its decision as long as it correctly applied the law to its findings of fact, regardless of the conclusion this Court may have reached if we were permitted to make the decision in the first instance. *S.K.L.R.*, 256 A.3d at 1124.

We note that Father's characterization of the situation as one with a simple original solution—CYF's provision of childcare assistance instead of removal—certainly has some logical appeal. But this logic holds only when

divorced from the trial court's individualized assessment of the situation and the facts in the record. Father has persistently maintained his steadfast belief that his arrangement adequately met Child's needs. He refused to cooperate with CYF from the outset, rejecting communication from CYF during Child's original suspension from school even before the police got involved and took protective custody of Child several weeks later. He walked out of court at the adjudication hearing and refused CYF's contact before the solutions he now (belated) proposes could even be discussed. He repeatedly refused to recognize the court's lawful exercise of its power to remove Child from his care—at times telling Child that she was kidnapped or taken illegally—yet he initially opted to forgo his right to counsel and never exercised his right to appeal until now. As CYF aptly states in its brief, Father sacrificed Child's needs and wellbeing "to make a point," punishing Child for burdens he perceived as unfair. CYF's Brief at 37, 44.

As for Father's strenuous argument that cooperation and communication with CYF is "unnecessary to achieve reunification" and that "obeying the commandments of the dependency court and [CYF] are separate" from the appropriateness of a parent's provision of care to a child, *see* Father's Brief at 36, 39, this is contrary to the law of this Commonwealth. His argument appears to rest on the incorrect notion that the parent's fundamental right to rear his child privately, free from intrusion from the state, is unlimited. It is not. *See William L.*, 383 A.2d at 1246. A parent's cooperation with the child

welfare agency is not dispositive of, but is relevant to, determining whether proper parental care is immediately available prior to removal and adjudication.[14]   *Int. of S.D.*, 334 A.3d 919, 930 (Pa. Super. 2025). Cooperation and contact remain crucial after a child has been placed in foster care, as a "parent has an affirmative duty to work towards the return of the child," *William L.*, 383 A.2d at 1233, which includes a "willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities." *In re Adoption of J.J.*, 515 A.2d 883, 890 (Pa. 1986).

As testified by the CYF casework supervisors in the case at bar, which the trial court credited, Father's lack of cooperation and participation with CYF prevented the case from progressing to achieve reunification.  Father's failure to attend hearings stymied the court's important oversight of the requirements CYF imposed upon Father.  Father's refusal to cooperate was not just a power struggle between a citizen and the government; crucially, it also was a refusal to engage with the entity who had legal custody of his child, empowered by law to ensure the child's developmental, physical, mental, and emotional needs were being met.  We certainly do not overlook the difficulties

---

[14]  This is not to suggest that the agency has unfettered authority; there are limits on what the state can require a parent to do. *See, e.g., Int. of Y.W.-B.*, 265 A.3d 602, 620 (Pa. 2021) (government cannot condition a parent's basic right to be left alone and raise her children on periodic home inspections unsupported by probable cause).

a parent faces when fighting to regain custody of a child, but Father's "solutions" to his perceived systemic injustices came at the cost of Child's need for her parent. Pointedly, his solution to the "unwarranted" intrusion upon his privacy during phone calls and visits with Child was to have no contact with her at all.

Thus, we agree with the trial court that the true crux of the case is not childcare; it is Father's ability or willingness to prioritize and meet the full range of Child's needs. The trial court's task under section 2511(a)(2) is to examine whether a parent, even in the most challenging of circumstances, has been willing or able to provide essential parental care, control or subsistence that is necessary for the child's physical or mental well-being and whether the parent can or will remedy the causes and conditions of that deprivation in the future. The record is replete with examples of how Father failed to tend to Child's developmental, physical, mental, and emotional needs, particularly when Child needed him most—after her placement in foster care. Because the record supports the trial court's findings under subsection (a)(2), and the trial court reasonably applied its findings to the law, we discern no abuse of discretion.

**Needs and Welfare**

We now turn our attention to subsection (b). When considering whether termination of parental rights serves a child's needs and welfare, courts must consider the matter from each child's perspective, placing the child's

"developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *In re T.S.M.*, 71 A.3d 251, 268-69 (Pa. 2013).

When determining whether the petitioner met its burden of proof that termination best serves a child's needs and welfare, the trial court must consider, at a minimum, the factors delineated by our Supreme Court in *K.T.*, all of which are of "'primary' importance in the [s]ection 2511(b) analysis" and "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare." *K.T.*, 296 A.3d at 1109. The trial court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* If a bond exists, the court must ascertain the effect upon the child of severing the bond. *Id.* Because the severing of any parent-child bond may be emotionally painful for a child, the trial court cannot preclude termination based solely on evidence of an "adverse" or "detrimental" impact to the child. *Id.* at 1110-11. Instead, focusing upon the "child's development, and mental and emotional health," the trial court should assess whether severing the bond "is the kind of loss

that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child.  *Id.*  When a bond to a parent is "strong but unhealthy," our Supreme Court has recognized that the considerations that a trial court must weigh may contradict each other.  *T.S.M.*, 71 A.3d. at 268-69.  In that case, the court must weigh the pain the child will experience against the damage that bond may cause if left intact and consider whether the bond is impeding the child's opportunity to find a permanent stable loving home.  *Id.*  at 269.

The parent-child bond, however, is "but one part of the overall subsection (b) analysis."  *K.T.*, 296 A.3d at 1113.  The trial court must also consider

> the child's need for permanency and length of time in foster care consistent with [the Juvenile Act,] 42 Pa.C.S. § 6351(f)(9) and [ASFA], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.*

When conducting "a full subsection (b) analysis focused upon the child," the trial court has "discretion to place appropriate weight on each factor present in the record."  *Id.*  However, when "weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly."  *T.S.M.*, 71 A.3d at 269.

Trial Court Reasoning

The assessment of whether termination serves Child's needs and welfare was undoubtedly the most challenging aspect of this case. The trial court acknowledged Child's bond with, and love for, Father, describing this situation as "heartbreaking." *Id.* at 21. But because Father has not responded to Child's emotional needs time and again, the court determined that Child's bond with Father is "not a healthy one[, a]nd as such is not beneficial and therefore not necessary." *Id.* Although Dr. Bliss was limited in offering her opinion regarding the relationship between Child and Father, her responses to hypothetical questions provided "insight into the potential impact" termination of Father's rights would have on Child. *Id.* at 22. Based upon Dr. Bliss' testimony about a child who is aware that a parent is refusing to visit with them, or who sees a parent fail to show up or to arrive and leave without visiting, the court concluded that it is highly likely that Child experienced a "[b]ig let down." *Id.* Even more concerning, the court found that this behavior likely caused Child to receive messaging that she cannot rely upon Father to meet her needs, which risked her internalizing Father's failures as her fault, negatively impacting her ability to trust others. *Id.* While the court declined to attribute Father's refusals to visit as the sole cause of Child's behavioral outbursts, it found that it was a contributing piece. *Id.* at 23.

The trial court considered that Child's current foster family was willing to adopt her, that they were doing an excellent job caring for her, and that

Child thinks so, too. *Id.* at 24. The court acknowledged that adoption was not Child's first choice, but she told Dr. Bliss that she is happy in her foster home, which was significant given the defensiveness and protectiveness she displayed when talking about Father to Dr. Bliss. *Id.* Because the foster family has helped Child navigate her behavioral problems since being placed with them and participated in services, the court concluded that the foster family was willing and able to meet Child's needs going forward, including helping her through the pain of losing Father. *Id.* The court found it significant that Child mentioned missing her siblings when she told Dr. Bliss that she wanted to reunify with Father. *Id.* The court relied upon cases indicating that an agency petitioner does not need to prove that a child will consent to adoption, that a child's feelings are not dispositive, and that "an unhealthy bond" is a "factor leaning towards termination of parental rights," not to maintain parental rights. *Id.* Because the court determined that Child's bond with Father "no longer helps but rather hinders" her, it decided that terminating Father's rights is both "justified" and "right," notwithstanding the pain she may experience. *Id.* at 27.

### Father's Arguments

Father asserts that the evidence was not sufficient for the trial court to conclude that his bond with Child was not healthy or beneficial. *Id.* at 44, 49. In his view, the evidence supports the opposite conclusion—that severing the parent/child bond between Father and Child through termination would be

"extremely detrimental to Child," just as her removal from his care has been. *Id.* at 44-45, 49. According to Father, none of CYF's witnesses competently assessed the bond or the effect upon Child of severing it: both CYF supervisors had only observed brief interactions between them; Bauer had never seen them interact; and Dr. Bliss could not offer an opinion regarding termination or bond. *Id.* at 46, 48. McPaul, on the other hand, testified that Child seemed happy to see Father and the visits she supervised went okay, and Child's former foster mother testified that Child talked about Faither daily and was thrilled when he sent baby pictures of her. *Id.* at 45-46. Father introduced photographs depicting his happy and loving interactions with Child at visits. *Id.* at 47. He further emphasized that Child prefers to live with him, misses him, wants to spend more time with him, enjoys their visits, and feels safe during visits. *Id.* at 49.

Father points to the behavioral issues Child has experienced since entering foster care, arguing that this establishes she will continue to struggle if the court permanently severs her relationship with him. *Id.* at 45-46. He also cites Dr. Bliss' testimony that a child with a deceased parent may be particularly impacted by the loss of the second parent, asserting that severing her bond with Father would be particularly harmful to Child. *Id.* at 49-50.[15]

---

[15] Child agrees with Father's position, contending that the trial court failed to adequately consider her needs and welfare as the only way for her to maintain a relationship with Father and her siblings is by allowing Father to retain his

*(Footnote Continued Next Page)*

Analysis

In reviewing the trial court's decision, we are particularly cognizant of Child's position against termination of Father's rights and her admonition not to deprive her of her relationship with Father simply because of Father's actions. The trial court, however, recognized Child's view and gave it considerable weight when making its determination. The trial court's analysis reflects careful consideration of the factors that both support and oppose termination under section 2511(b). Once again, we stress that simply because another jurist could weigh the same factors and arrive at a different result on this record does not mean that the trial court abused its discretion. *S.K.L.R.*, 256 A.3d at 1123-24; *In re M.E.*, 283 A.3d 820, 838-39 (Pa. Super. 2022) (holding that trial court did not abuse its discretion in prioritizing child's safety and security needs over the bond with her parents, despite detrimental impact to child, in a case that was a close call). The court considered, on the one hand, Child's love for Father; the detrimental impact that Child will experience in severing her bond with him; and her connection to her siblings in her birth family. It then weighed these considerations against the unhealthy nature of Child's bond with Father; the detrimental impact on Child of maintaining a bond with a parent who has been inconsistently present and consistently

---

rights. Child's Brief at 16-18. CYF defends the court's finding that termination serves Child's needs and welfare, arguing that its evidence proved that termination will not be any more detrimental to Child than the inconsistency and uncertainty Father creates with behaviors towards her. CYF's Brief at 52.

unable to meet her physical, mental, and emotional needs; Child's two and a half years in foster care; her foster parents' willingness to adopt her; the foster parents' commitment to her through the rocky adjustment period; the bond she has forged with the foster family despite her loyalty to Father; the stability and security she receives in the foster home; and her current foster family's ability to meet her developmental, physical, emotional, and mental health needs. Upon weighing these competing factors, the court determined that although terminating Father's parental rights would cause Child pain, so would maintaining her bond with him. Examining Child's overall developmental, emotional, and mental health, the trial court decided that severing her bond with Father will not rise to the level of harm discussed in **K.T.**, that the bond hinders more than helps her, and that the pain she will experience does not dwarf the tangible and intangible benefits Child will receive from remaining in the home of her current foster family, experiencing their love, consistency, and ability to meet her needs.

While an interactional evaluation between Father and Child may have provided additional useful information, its absence does not mean that the trial court had insufficient information to assess whether the bond was necessary and beneficial to Child and the likely effect of severing the bond. Neither section 2511(b) nor precedent require the trial court to utilize a formal bonding evaluation by an expert when analyzing the parent-child bond. **In re K.K.R.-S.**, 958 A.2d 529, 533-34 (Pa. Super. 2008); **see also In re E.M.**,

620 A.2d 481, 485 (Pa. 1993). In accordance with the language of subsection (b), it is the trial court who must analyze "the child's welfare and all her developmental, physical, and emotional needs," by considering a variety of factors. *K.T.*, 296 A.3d at 1113; *see also* 23 Pa.C.S. § 2511(b).

In addition to contributions from other witnesses, McPaul's testimony and contemporaneous notes from the visits between Child and Father provided insight into their interactions over time. Her observations reflect the mixed aspects of their relationship: the positive and loving interactions as well as the harsh and pressured interactions that left Child nervous, sad, scared, and upset. Viewed as a whole, the observations of their visits together show a pattern of Father placing the adult burden of his negative experiences and expectations upon Child, failing to recognize her developmental, mental, and emotional needs, or viewing the circumstances from her viewpoint as a child. They also demonstrate that Father's actions and inactions had a heavy impact upon Child, whether he intended them to or not. It was reasonable to infer from this record that Child's emotional difficulties and resilience derive from all of the hard things she has had to endure in her ten years, instead of a singular source: Mother's death; removal from Father; placement away from her siblings; Father's inconsistencies, absences, and inattentiveness to her full range of needs both before and after she was removed; and adjusting to major changes in her homes, school, daily life, and caregivers. That the trial court chose to prioritize the stability, comfort, and emotional support she receives

in her foster home over her relationship with Father in such circumstances is not an abuse of discretion, as hard as the loss has been and may continue to be for Child.

Because the trial court's factual findings are supported by the record, it considered the correct legal factors, and it properly exercised its discretion in weighing the competing considerations, we discern no abuse of discretion its analysis of Child's needs and welfare.

### Ineffective Assistance of Counsel

Father next contends that Attorney Crist was ineffective for failing to retain a private psychologist independent of the court to conduct his individual psychological assessment and an interactional assessment of him with Child. Father's Brief at 50, 53. Father argues that the trial court's on-the-record commentary clearly shows how beneficial an independent evaluation would have been, particularly given its rationale for granting termination. *Id.* at 52-55. Father emphasizes that he "did not have the burden of proving that termination of his parental rights would NOT serve Child's needs and welfare" and argues that pursuant to *E.M.*, CYF failed to meet its burden of proof because its expert could not offer an opinion regarding his relationship with Child. *Id.* at 52-53 (citing *E.M.*, 620 A.2d at 484-85). Father was willing to undergo an evaluation, he says, as evidenced by his physical presence at Dr. Bliss' office, but he objected to signing the consent form authorizing dissemination of the report to CYF and the court without his ability to review

it in advance and withdraw consent if the report was inaccurate or unfair. *Id.* at 56. Father requests that we remand for the trial court to conduct an evidentiary hearing on the question of whether trial counsel had a reasonable strategic basis for failing to hire a psychologist to conduct the evaluations. Application for Remand, 12/4/2025, at ¶ 20.

In Pennsylvania, indigent parents have the right to effective assistance of counsel in involuntary termination of parental rights cases. 23 Pa.C.S. § 2313(a.1); *In re Adoption of R.I.*, 312 A.2d 601, 602-03 (Pa. 1973); *Interest of I.M.S.*, 267 A.3d 1262, 1265 (Pa. Super. 2021). Based upon the child's interest in permanency and finality, the parent cannot attack counsel's stewardship in a collateral proceeding and must raise a claim of ineffectiveness of counsel on direct appeal. *In re S.W.*, 781 A.2d 1247, 1249 (Pa. Super. 2001). This Court reviews "the record as a whole to determine whether or not the parties received a 'fundamentally fair' hearing; a finding that counsel was ineffective is made only if the parent demonstrates that counsel's ineffectiveness was 'the cause of the decree of termination.'" *In re J.T.*, 983 A.2d 771, 774-75 (Pa. Super. 2009) (citation omitted). "Mere assertion of ineffectiveness of counsel is not the basis of a remand or rehearing, and despite a finding of ineffectiveness on one or more aspects of the case, if the result would unlikely have been different despite a more perfect stewardship, the decree must stand." *S.W.*, 781 A.2d at 1249 (citation omitted).

Father has failed to establish the merit of his claim, let alone that Attorney Crist's failure in this regard was cause of the decree. He spends most of his argument defending his decision not to undergo an evaluation with Dr. Bliss and the reasonableness of his distrust of a forensic psychologist appointed by the trial court, and of the child welfare legal system overall, and awards very little real estate in his brief identifying the precise nature of counsel's alleged failure. ***See, e.g.,*** Father's Brief at 51 (alleging that Attorney Crist was "ineffective for failing to retain a private psychologist"); ***id.*** at 57 (alleging that Attorney Crist should have "simply hired a private psychologist"); ***id.*** at 50 (generally asserting that that attorneys who represent parents in dependency matters should hire psychologists "[a]s a matter of course"). He does not allege that counsel refused to present the testimony of a psychologist upon his request or identify a psychologist who would have been willing to conduct evaluations under privacy terms that were satisfactory to him and render an opinion in the manner that he proposes. ***Cf. Commonwealth v. Luster***, 71 A.3d 1029, 1047-48 (Pa. Super. 2013) ("In particular, when challenging trial counsel's failure to produce expert testimony, the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence.") (cleaned up). Nor does he argue specifically that counsel failed to ask the trial court to appoint—and pay for—a psychologist. We presume this is the true nature of his claim based upon two practical realities limiting any indigent parent's

ability to present an alternative forensic psychologist in a termination case involving a dependent child: the high cost of such services and restrictions upon the parent's exercise of physical and legal custody of their child.

Yet Father cites to no law establishing that an indigent parent has the right to the assistance of experts necessary to prepare a defense in a termination of parental rights hearing. *Cf. Commonwealth v. Albrecht*, 720 A.2d 693, 707 (Pa. 1998) (noting that due process requires provision of public funds to appoint an expert necessary to prepare a defense in a criminal trial). Father baldly asserts that he "should not be forced to sacrifice one right in order to protect another," and that he "is entitled to all his rights guaranteed by the federal and Pennsylvania constitutions, as well as those rights created by the legislature," *see* Father's Brief at 50, without ever identifying with specificity what those rights are and how they relate to retainment of a psychologist not routinely appointed by the court. We are aware of nothing in the Adoption Act, the Juvenile Act, or our procedural rules requiring the appointment Father now seeks. Nor does Father point to any case holding that the state or the federal Constitutions provide such a right. Even in a capital criminal case, "counsel's performance must be measured by the legal landscape in existence at the time counsel had to act… Counsel cannot be faulted for failing to advance a novel legal theory which has never been accepted by the pertinent courts." *Commonwealth v. Jones*, 811 A.2d 994, 1005 (Pa. 2002).

What precedent does exist regarding psychological evaluations protects a parent's privacy against compulsory evaluations or mandated disclosure of evaluations or notes in dependency matters; but—in a caveat that swallows the right in many cases—the same precedent allows a court to take a parent's refusal to submit to an evaluation into consideration when making decisions concerning the child. *See In re K.D.*, 744 A.2d 760, 762 (Pa. Super. 1999); *In re J.Y.*, 754 A.2d 5, 9 (Pa. Super. 2000); *In re D.S.*, 102 A.3d 486, 489–92 (Pa. Super. 2014). Furthermore, as discussed hereinabove, the Adoption Act and applicable precedent do not require the trial court's use of a formal bonding evaluation by an expert at all. *See In re K.K.R.-S.*, 958 A.2d at 533-34. Thus, Father's claim of ineffectiveness lacks merit.

Even if there were some merit to Father's claim of ineffectiveness, it would fail on prejudice grounds. His claim is entirely too speculative, as he is only assuming that the expert may have evaluated the bond in a more positive light. Assuming, arguendo, that the evaluation would have proved as Father hoped, he cannot establish that the absence of the independent evaluation was the cause of the decree. Pursuant to *K.T.*, the trial court had "the discretion to place appropriate weight on each factor present in the record." *K.T.*, 296 A.3d at 1113. As discussed above, the trial court already found that Child and Father had a bond and that the severance of that bond would be detrimental to Child. It found, however, based upon the totality of the evidence presented—including Father's failure to recognize, let alone meet,

Child's developmental or emotional needs both prior to and following her removal from his care—that the bond was unhealthy and maintaining it was harmful to Child's wellbeing. Although the trial court found Dr. Bliss' responses to certain hypothetical questions regarding Father and Child's relationship to be useful, there is no support for any claim that the trial court relied upon Dr. Bliss in reaching its conclusion that Child's needs and welfare were best met by terminating Father's parental rights. Therefore, we cannot conclude that the absence of an independent psychological evaluation would have changed the outcome of the proceeding.

**Goal Change**

Finally, Father contends that the trial court abused its discretion in changing Child's permanency goal to adoption because it "did not correctly consider" the facts set forth in section 6351 and CYF failed to prove a goal change was in Child's best interest. Father's Brief at 68. A goal change to adoption, however, is not a necessary prerequisite to allow a trial court to involuntarily terminate a parent's rights. *See In re Adoption of S.E.G.*, 901 A.2d 1017, 1029 (Pa. 2006). The effect of our decision to affirm the trial court's termination decree necessarily renders moot the trial's decision to change Child's goal to adoption. *See Interest of D.R.W.*, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force of effect.").

**Conclusion**

- 46 -

Based on the foregoing we affirm the decree terminating Father's parental rights to Child. We decline to address his challenge to the goal change as it is moot. Because he failed to establish that his claim of ineffective assistance of counsel has merit or that he was prejudiced thereby, we deny his application for remand.

Decree affirmed. Order affirmed. Application for remand denied.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/24/2026